for oral argument. 19-2846 from the District of South Dakota, United States v. Jeremy Aungie. Thank you. Mr. Von Wald, we'll hear from you first. Thank you. May it please the court, counsel, my name is T.J. Von Wald and I represent the defendant Jeremy Aungie in this matter. I want to thank the court for the opportunity for these arguments regarding his criminal conviction. Jeremy is asking that the court reverse the district court's denial of his motion for acquittal and determine that there was insufficient evidence to uphold the guilty verdicts in this matter. In the alternative, Jeremy is asking that this court determine there were various abuses of discretion regarding evidentiary matters that would warrant a retrial in this matter. I want to touch just a little bit on some background because that feeds into a lot of the arguments that Jeremy has in this matter regarding all of the issues. Jeremy is a member of the Akosu tribe in South Dakota. He grew up and basically lived around Wagner, South Dakota his entire life. He's got two kids, J.A., who's about 17 now, and A.A., the alleged victim, who is about 16 now. At the time of the allegations, Jeremy lived in a small house outside of Wagner, South Dakota that was owned by his mom and dad, Pam and Del Aungie. It was just a small three-bedroom house. It had two bedrooms on one side of the house and one on the other. In between was a living room and a kitchen. Now in this small house, there was a total of 12 people. There was Jeremy and his two who had one of the rooms, Jeremy's adult sister who had a room, Jeremy's adult brother who lived in the living room area, and then Jeremy's five nephews and nieces that also stayed in the living room area. To say that this house was full and that somebody was always around is probably an understatement. Pam Aungie, his grandma, that's Jeremy's mom, it was her house and she ran the and if they didn't follow those rules, people got in trouble. In the spring of 2018, when A.A. made her allegations, her disclosure against Jeremy, A.A. was getting in trouble at school. She had been suspended and that violated and broke Grandma Pam's rules. A.A. got in trouble and was forbidden from going places and Grandma Pam took her phone and smashed it. As noted in the trial, this was her lifeline. This was at the time a 13 going on a 14 year old and she used her phone on a daily basis. She lived out in the country. So when that happened, shortly thereafter, A.A. decides I'm going to run away and go live with my mom, which mom did not have custody of A.A. but did get to see her on occasion. A.A. ran away, lived with mom for a couple days, and then these allegations are now made. Jeremy was charged and convicted last summer of the two counts of aggravated sexual abuse. The main issue that I think we need that I'd like to focus on here is the circuit court's denial of the motion to acquit. This is, I understand that that's a heavy burden to carry and that overturning verdicts just doesn't happen very often. It's in the rare circumstances, but this is one of those rare circumstances where it's appropriate. The focus is on A.A.'s testimony. The reason the focus is there because that's the only evidence throughout the entire trial that any sexual abuse of any nature occurred. There were no physical evidence. There's no corroborated statements. There's no recorded statements, text messages, emails. There's no expert reports. There's nothing except for A.A.'s testimony. And regarding A.A.'s testimony, when read as a whole, it's vague, it's generic, and a lot of times, and I should have counted them how many times she said either I don't know or I can't remember, but that was the response until prompted further by the a reasonable jury, Ken, Vic, Jeremy. Moreover, A.A. had a motive because the allegation from our perspective, the theory is she made it up. She didn't want to live at home. She wanted to go live with mom, and she had a motive to do so. She was getting in trouble at home, and mom was the one person, as she stated on cross-examination, the one person she had always wanted to live with, and she accomplished that. She got away from the chaos that Grandma Pam saw. She got away from the rules, and she got to go live with mom. Now, counsel, isn't all of this really a credibility call for the jury? I mean, we've held, I found a case from 1976 where we said even the uncorroborated testimony of a single witness could be sufficient, and so ultimately the, I mean, this may get into your evidentiary issues, but on sufficiency, isn't it enough that the jury made the credibility determination? Yeah, I understand that, and I appreciate it, and I understand it's a high burden. No, I don't think it's enough in this particular case. I mean, I know it can happen, but in this particular case, without the details that come from or what should come from a 13-year- old girl or 14-year-old girl, the jury can't make that decision that my client's guilty based off that testimony. Amanda Libel, she was the government's witness. She was the forensic interviewer, and she testified that a 13-year-old girl should be able to state the who, the when, or a time frame when things may have happened, as well as what may have happened, and that's not my witness. That's the government's witness, and so when that detail doesn't come up, then that's where the district court needs to step in and say, I'm sorry, there's just not enough here to convict beyond a reasonable doubt, and in this instance, it's where the ace circuit could come in and say, this jury should not have convicted this person. There's not enough evidence there. There's examples throughout AA's testimony all over, and I just want to pull out a couple of them. When asked for the first time, AA was asked, when did Jeremy physically hit you, because they talked about physical abuse as well. Her response was, I can't remember. And that's found in the trial volume two, page seven. I got to say, I sat on a state court for seven and a half years. We had a lot of rape, sexual conduct type cases, and what you're saying is not unusual. Sometimes there is, especially when you're dealing with kids. Sometimes there's physical evidence. Usually there is not, and usually you have a single witness to complain at making the argument. So, I mean, if the argument you're making here, I mean, doesn't it potentially affect more than more than just this case if we were to accept it? It could, but I think everything's so fact-driven in every different case that I don't know if it's just going to be a bright line rule that if you don't have some type of corroborating evidence, you can't have a guilty verdict. I don't think that's necessarily the case, especially with the history and the case law that's out there. But in this particular case, I think that is what needs to happen, because given everything else, you know, nine other people in that tiny little house where you can hear wall to wall, never heard a word. There was always somebody around. Nobody even thought for a second that anything like this was happening. You've got adults there all the time. You've got other kids there. Everybody was interviewed by the FBI, everybody. The kids were interviewed by the child forensic people, but the adults were interviewed by the FBI. The one person that wasn't interviewed by the FBI was the mom who AA was staying with for three days before these allegations come out, coincidentally. But it's neither here nor there. But that's the difference in this case beyond, you know, potentially some other case where you may have only one witness that has a story of what happened and no other physical evidence. It's just it's an impossibility that nobody heard anything. She claims at times, AA claims at times she yelled out and screams, but nobody heard her. Or she never said anything when somebody is six feet away. Now, I get it that, you know, children all react differently, and if this occurred, maybe she tried to bottle up and not do anything. But that wasn't her testimony. Her testimony was at times she would cry or she would yell, and nobody heard anything. Nobody ever thought anything. Her brother, who shared a room with her dad and her, and she claims these things happened at night, never knew a thing. She said her brother was her protector and that she told him things. In fact, she told her brother that she's going to run away and go live with her mom. He never knew a thing about that. Grandma Pam never knew a thing about that. The medical doctors that she saw both before the allegations and after, nothing. So it's one of those where the outside, the extrinsic side of this is so void of anything that would even come close to corroborating that that puts this case in the realm of no reasonable jury could have found the defendant guilty. There's lots of other examples throughout her testimony where she just struggled to give any detail whatsoever. On a redirect examination, I thought this was interesting that she was asked how many times Jeremy sexually assaulted her in the three or four months before she ran away and lived with her mom. Her response was, I don't know. I mean, this is days, months before her allegations. Then she was immediately asked, was it many times? And she said, I don't know. And then when asked if it was more than once, she just said, yeah. And when she said was it more than five times, she just said, yeah, in an effort. To me, it's not like she's just acquiescing to the questions to be done and be out of there. So I mean, it's that lack of detail that should be coming out that just didn't come out. And that's one of the reasons why this matter should be taken from the jury at that point. The physical evidence I talked about, there was absolutely nothing there. She had trouble, AA had trouble, well, she didn't describe the details. When she did talk about any type of penetration or any type of sexual abuse, there was no answers about who was around. Sometimes she would say it happened at nighttime, but a lot of times there's no time frames. There's hardly any discussion about what she did in terms of yelling or screaming. And there was no indication of what clothes were being wore or anything like that. Just certain things that, according to the government's expert, she should have talked about. So that alone, I think, needs to be taken into consideration. And there just isn't, there needs to be something more before a jury can convict, before the judge even gave it to the jury and before the jury's verdict can be upheld. There needs to be something more. I want to touch on some of the other, the evidentiary issues. And I understand all the standards of abuse of discretion. And that, too, is a very difficult standard to overcome, understand that. The first one I want to talk about is the other acts-type testimony that was brought up. In motions in limine, we brought up the fact that we don't want to talk about my client's, Jeremy's, background regarding alcohol and drugs. And Judge Pearsall is very clear, we're not going to talk about that, except if AA has testimony that says he was drunk or high when he sexually abused her. That was the one exception. But there were further statements that came up. In fact, AA was asked that question, was your dad drunk or under the influence when he sexually assaulted you? And the answer was yes. That alone did not violate the court's motion but when it went further on to ask, you know, how do you know? And she starts talking about, well, I've seen him with beer cans and I've seen that look in his face before. Now we're getting into this history that we weren't supposed to get into. And that's where the violation comes into play. Now a jury gets evidence that Jeremy either drinks often or does drugs because it was mentioned that he was high and it was mentioned of him, AA talks about, I know what a meth user looks like. And that's prejudicial. That's very prejudicial stuff. This isn't just a minor deal where he was drunk on one occasion or drank a couple beers here. I mean, this is the type of stuff, especially in, I don't want to call it a he said, she said, but the only evidence is testimony of this little girl. If they're going to think bad or get bad information about my client, then his credibility goes out the window and he's going to look like a terrible bad guy. There's, there's some evidence, uh, also about his physical abuse, uh, same argument there. Um, there's no clear convincing evidence that number one, it occurred, but two, the program value is not weighed by the prejudicial value. Can I ask you about that? So I think you're getting at the, by the violent bad acts, which my understanding, please correct me if I'm wrong. So in your opening brief, you talk about the alcohol and meth, but you don't talk about the violence. And then I understand the, um, uh, the, uh, government to have raised it, uh, in the, in the, in the red brief, and then you address it in the gray brief brief. Did you intend to actually appeal that particular issue or did it just kind of come into the case by virtue of the government's response? Yeah. You know, good question. And I'm trying to recall back till, uh, last fall when we were putting this together. Yes. I mean, I think the short answer is I probably missed it in the first brief and it probably should have been in there. Um, I was focused on the alcohol and the drugs as opposed to the prior physical violence because Judge Pearsall did say, look, if she saw violence, we're going to talk about it. And, but there, there were instances where she's talking about, um, violence that's unrelated to sexual assault and, and unrelated to things that would basically scare her from not talking about what happened. That was Judge Pearsall's reasoning. So, uh, the government brought it up and I responded, yes, that's one issue that I think should have been included in that initial brief as well. Yes. Um, so, uh, regarding the other acts evidence, I believe that, uh, it, it is prejudicial and should have been, uh, kept out and warrants a retrial. Uh, I'll talk briefly, I want to prior to the trial, the government did, uh, disclose two experts, Amanda Libels, a forensic interviewer, and, and Brooke Jones is the pediatrician. They're both with Child's Voice here in Sioux Falls and do all the, um, forensic interviewing of potential sexual assault cases. Uh, I, I asked that they not be included. And then the alternative asked for a dog bear hearing, uh, the, uh, at the time Judge Schreier had the case, she said, uh, they're going to be allowed to testify and you're not getting a dog bear hearing. Uh, at trial, generally speaking, both experts are credentialed and, and can generally talk about their areas. Dr. Jones can talk about the medical side of being a pediatrician and, and Ms. Libel can talk about the various aspects of a forensic interview. But the, the part that I have a problem with is when they start quoting, uh, during their testimony, very particular, uh, studies with, with statistics and, um, things that they rely on. Brooke Jones, Dr. Jones talked about how a certain, a very high percentage of alleged abuse cases don't have any physical findings. Uh, and that was Brittany. She related that to some studies and Dr., and Ms. Libel said the same thing about late disclosures. The studies show this. The problem is I, that's the first I heard. Um, and to put forth a defense is kind of difficult when you're getting it on the fly like that. Through a dog bear hearing, we would have fleshed that out, would have been able to talk about it, and they would have had an opportunity. Even if they, Judge still said, yeah, they're going to testify, at least I would have known and I could have done some research and been able to get through it. Um, I felt that that was, um, an abuse of discretion by not allowing that dog bear hearing to, to look at their credentials and more importantly, the facts they rely on. And, and I thought that that was an abuse of discretion as well. Regarding the, uh, text messages and AA's bad behavior, uh, those were brought up, uh, during, uh, my experts, I had a forensic computer person look through AA's phone and there was many, many text messages. Uh, I asked generally on direct about those and on cross, the government pulled out a handful and read certain text messages basically where Jeremy would use foul language towards AA. Uh, in response, I wanted to put some context to those, uh, text messages and do basically the same thing, read a couple in and, uh, Judge Pearsall said, no, that hearsay and then allow them in. Without allowing them in, I felt that the jury got to, got an impression, a bad impression from just the, the several text messages they got to hear instead of, uh, getting all the context there. What was the basis for allowing in the government's, uh, uh, reading of the text messages? I didn't object because I wanted them to come in. Yeah. I wanted all the text messages to come in quick. I see. Yeah. Yeah. So that's where that question about the text messages, uh, when you argue the rule of completeness, do you have any foundation or offer of proof to show how your proposed messages related to the ones that came in? Uh, I'm bad if it's in the record. Yeah, no, we did not have a separate hearing with an offer of proof. I asked the question by basically referring to the particular text message so that I didn't read it totally, but I asked enough about it that we got the gist of it. So that, that's. But I mean, how do we know that the context of your proposed message was connected to the other messages such that the rule of completeness should apply? Right. Uh, are you, are you not really claiming that they were part of a same conversation? You're just saying more broadly, you want to show that he had some positive communication with the daughter? That's right, Your Honor. Just the broad scope. I see I've only got 15 seconds left. All right. Reserve that place. Thank you. All right. You, uh, very well. Thank you for your argument. Mr. Clapper, we'll hear from you. Thank you, Your Honor. On behalf of the government, we're asking this court to affirm the conviction of this defendant, Jeremy Omgee, for two counts of aggravated sexual abuse. The evidence in this case was sufficient. The jury found that, and the jury's verdict should be supported. One of the judges, I'm not sure which one, raised the issue that, you know, it's long-standing law in this court and many others that the testimony of one witness, if believed by a jury, is sufficient to support a verdict. And in fact, this court recently held that in October, I mean earlier this month, in the case of United States of America versus Cyrus Free, that's exactly what we had here. And of course, the basis for the court making that ruling is because the jury is the one that's there being able to observe the judge, the credibility of the witness. And what this court doesn't get to see, of course, is the testimony of the witness who was a 14-year-old girl on a witness stand who was very visibly upset, crying during a lot of her testimony. And of course, that's not hard to believe considering what happened to her, what the defendant, who was her own father, right in the courtroom, and then having to testify against him in front of a room full of strangers. There, despite the criticism of her testimony, her testimony being vague and generic and lacking specificity, there are plenty of examples where she did not give just one word of answers. And she adequately described the sexual acts that this defendant perpetrated upon her, including when she was eight, nine years old, touching her vaginal area beneath her underwear with his hand and penetrating her vaginal area with his penis. And then she also described for count two when she was 13 years old a few different times of the defendant sexually abusing her. It's not unrealistic for a jury, a reasonable jury, to believe the testimony that she provided under the circumstances that she provided. And this court should affirm the jury's verdict in this case. By the way, all the arguments that counsel or Mr. Ongie has made to the court today were the very same arguments that were made in closing argument to the jury, and the jury chose to disregard them. They had the consideration of all of those arguments and sat through the entire trial and observed all the evidence and testimony. If the court has particular evidence issues, I'd be glad to discuss those as they're raised. Otherwise, I can just go through them in the order addressed by counsel. I think one of the judges asked about the text messages near the end. What was the basis for that? The basis for that, the evidentiary rule, whether or not the defense would have objected to it or not, is 801D2. They were statements against a party, which is the very basis that the district court ruled they would not be permitted when offered by the defense, which is the longstanding rule. You can't try to get in your own client's testimony without them taking the stand. And so the court made a proper ruling and didn't abuse its discretion as it related to the text messages. And as to the text messages trying to get a present sense impression, I think this court ferreted out exactly what was going on. They were not connected to some of the text messages the they were other text messages. They certainly didn't apply to any present sense impression about some other act that they were trying to offer proof of. The other evidentiary matters that the defense argues were improperly excluded, such as school behavior and the mother seeking additional visitation. If the court looks at the record closely, you'll see a lot of that kind of evidence did come in. And the court, the district court properly exercised its discretion on marshaling which of that testimony was permitted and which was not. But the defense was permitted to get a lot that evidence in and made those arguments in closing argument to the jury. As well as getting information about her getting in trouble in school. That came in through not only the victim on cross-examination, but also the victim's grandmother. Counsel, one concern I have with this case is where you started, which is, you know, there is just one witness, the 14-year-old. And the fact of the matter is, it's one of the things we often use when looking at evidentiary issues is, is the evidence otherwise overwhelming? Well, I can't exactly say that the evidence here was overwhelming without physical evidence and otherwise. And so I understand that some of this evidence is harmless for another reason, because other evidence came in. But how would you respond to that? Because we do have a lot of evidentiary errors alleged here. My response to that, Your Honor, and I would probably refer to my own closing argument, but you know, a lot of the evidence the defense wanted to get in about her bad behavior, some of the other physical findings I've heard during the physical examination, the burning of herself with the red boots, those are actually evidence of her acting out regarding the sexual assaults that occurred to her. The sexual abuse caused this child to go from getting good grades in school to flunking many of her classes, to participating in a lot of fairly healthy child to one that was cutting and self harming herself. Are those directly attributed to the sexual abuse that the jury had evidence of? You know, no one made that determination, but it's not hard to make that connection. And so in a way, her testimony about the sexual abuse that occurred was actually corroborated by other subconscious things that she had going on in her life. All right. Did you want to address any other of the issues or have you covered what you wanted to cover? You have time left. I'm not trying to cut you off. Sure. No, I appreciate that, Your Honor. I think the only thing left would be the experts. I think on that issue, the court made a proper ruling. It doesn't have to have a Daubert hearing before every expert that's proposed. These particular experts proposed by the government are that are commonly appear before the court, district courts, and these types of cases. And the notices provided by the government put the defense on notice as to all of the topics that would be covered. And the court didn't abuse its discretion in allowing that type of testimony. What about the studies? Oh, go ahead. I'm sorry. I'm sorry. Oh, the studies is what I was asking about. So there's two issues on that, but I would refer first to the Johnson case. I believe he cited that. And it had to do with a method of a model that they used to question witnesses. And as this court pointed out, the substance of the objection had nothing to do with the substance or validity of what the expert was talking about. And the same is true here. Amanda Libel, the forensic interviewer, all she said in her direct testimony was there were studies that have shown that forgive me for dropping the ball on this. There's research that supports that disclosure of childhood maltreatment doesn't happen immediately and may not happen at all. Well, that's the exact notice that I put in our notice regarding her. She wasn't citing a particular study, a year, data, or anything like that. And in fact, defense counsel raised more of those issues on his cross-examination of her. So he was certainly prepared for that. As for Dr. Jones, her testimony was that there was, there has been some research that she's seen that most of the time, there aren't any injuries to the genital areas of victims, childhood victims that she sees. That was based in part on her own experience as well as research that she's had. Again, that was noticed or provided in the notice by the government. Didn't cite to a particular study, but it's not that the defense can claim they were caught by surprise when they were notified. With no more questions, I thank you for your time. Thank you for your argument. Mr. Clapper, Mr. Von Wald, would you care to make a rebuttal? Yes. Thank you. Very, very briefly. First off, there's no evidence that the sexual assault caused this girl to go from a good kid to a bad kid. There's lots of things going on in this kid's life. Otherwise, you know, the evidence just wasn't there. There needed to be more and it wasn't there. The district court should have granted the motion to acquit. Thank you. Very well. Thank you to both counsel for your arguments. Mr. Von Wald, thank you for your willingness to accept the appointment under the Criminal Justice Act. Mr. Clapper, thank you for your appearance today. The case is submitted and the court will file an opinion in due course.